# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-KA-00957-SCT

*CORWIN TURNER a/k/a CORKY TURNER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/03/96 |
| TRIAL JUDGE: | HON. BARRY W. FORD |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROY J. FARRELL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | JOHN R. YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/6/98 |
| MOTION FOR REHEARING FILED: | 8/20/98 |
| MANDATE ISSUED: | 2/2/99 |

**BEFORE PITTMAN, P.J., BANKS AND WALLER, JJ.**

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Corwin "Corky" Turner was convicted by a jury in the Circuit Court of Lee County on August 22, 1996, of the crime of DUI resulting in death. On September 3, 1996, the trial judge sentenced Turner to a term of twenty years imprisonment. On September 5, 1996 Turner timely filed his Notice of Appeal after the trial court's denial of his Motion for JNOV or in the alternative for a new trial.

## STATEMENT OF THE FACTS

¶2. The record reveals that on the morning of July 2, 1995, Rodney Sheffield and his wife, Sherrie, were traveling on Highway 6 toward Tupelo around 10:30 a.m. when they came upon a green pick-up truck weaving along the highway in such a manner that the Sheffields suspected the driver was impaired. Rodney followed the truck closely enough to take down the license plate number and to observe the three occupants of the truck. Rodney described the driver of the pick-up as having long, shoulder-length hair. He described the person seated in the middle of the pick-up as smaller than the driver. He thought this middle occupant could possibly be a child. Rodney gave no description of the third occupant who was seated in the passenger seat. Rodney testified that July 2, 1995 was a beautiful, clear day. Rodney followed the pick-up truck until it turned right onto Richmond Road,

where it almost ran off the road. Rodney stopped at a small grocery store adjacent to Richmond Road where he saw a police car. He reported what he had seen to the officer. Rodney was unable to identify Turner, in court, as the driver of the pick-up truck.

¶3. Sherrie Sheffield, Rodney's wife, also testified at trial. She testified that the driver of the pick-up appeared to be impaired, and that she saw the driver take a drink from a bottle as he drove. Sherrie described the driver as a "white male" with "long hair that was unkempt, real wild-looking." She testified that she could only see the top of the head of the middle occupant, and that she did not remember anything unusual about the passenger side occupant. Sherrie was unable to identify Turner, in court, as the driver of the pick-up truck.

¶4. James Stuard was the officer at the grocery store that the Sheffields spoke to. He was an officer with the Plantersville Police Department. Stuard got into his patrol car and advised the Lee County Sheriff's Department of the situation. The sheriff's department advised Stuard that they had no officers in the area, and asked him to leave his city limits and stop the vehicle. Stuard left in pursuit of the green pick-up truck. He testified that just as he got about four miles out of Plantersville, he saw dust flying in a curve. As he approached, he noticed that the vehicle matched the description given to him by the Sheffields. He also noticed that the green pick-up had collided with another vehicle. Stuard testified that he arrived on the scene of the accident at approximately 10:30 a.m.

¶5. When Stuard arrived the pick-up was lying on the passenger side with the three occupants stacked on top of one another. One person was on bottom which was on the passenger side door, the second person was on top of him, and the third person was on top of the second. The individuals were not able to get out of the truck. Stuard testified that the three individuals in the pick-up were elbowing each other and shoving around. They could move their hands, but not their bodies. He described them as "crammed in like sardines", and stated there was very little room in the cab. The person in the middle of the stack was yelling, "Get off of me, Corky." Stuard described the man with the "scraggly hair and a beard" as being on top of the pile, and closest to the steering wheel. Stuard recognized the individual who was closest to the steering wheel as Corky Turner. Stuard described Turner on that day as having shoulder length hair that was scraggly and unclean looking. He was unable to identify Turner in court saying, "I couldn't recognize him right now. He would have to have his beard and his hair back to the way he had it that day for appearance. I cannot recognize him." Stuard testified that the top of the pick-up had to be cut off in order to remove the three individuals. Stuard noticed several beer cans in the cab and the back of the pick-up, as well as an opened bottle of vodka. When Stuard ran the tag number, he found that the green pick-up belonged to Terry Moore, who was one of the three individuals in the pick-up at the time of the accident.

¶6. Stuard checked on the occupants of the second vehicle and found that the passenger was conscious, but the driver was not. He checked the driver's pulse and found that he did not have one, nor was he breathing. The driver of the second vehicle was Randy West and the passenger was Betty West. Stuard was relieved at the scene as soon as the Lee County Sheriff's Department arrived.

¶7. David Payne, who at the time was the fire chief of the Plantersville Fire Department, went to the scene of the wreck after hearing it reported on his radio. When he arrived at the scene, someone was doing chest compressions on Mr. West. Payne proceeded to the pick-up. He saw three individuals in the pick-up. He described their positions saying that, "there was one halfway in, halfway out, and

then there was two on--completely on the inside of it." He described the individual that was halfway out of the truck as partially baldheaded. The one on top of him had darkish hair with a mustache, and the person on top had "long, kind of light-colored hair and kind of a thin beard, kind of long." He had learned the names of the occupants of the truck. Payne testified that Leon was under the truck, Terry was in the middle, and Corky was on top. He stated that Terry kept talking to Corky. He was shouting, "Corky, get off of me." Payne described Corky Turner as being the person closest to the steering wheel. Payne testified that the three individuals could not have rearranged themselves in the truck because they could barely move. Payne was unable to recognize Turner in court. Payne noticed several cans of beer, both full and empty, at the scene as well as an opened bottle of vodka.

¶8. Sherry Riner, a volunteer with the Plantersville fire department, arrived on the scene at approximately 10:30 a.m. She testified that she went to the West's vehicle to help. Mr. West was unresponsive, and someone was performing CPR on him. She assisted with the CPR. When the medics arrived, she went to the pick-up truck where David Payne was working. She noticed that the three occupants of the truck were stacked on top of one another. She did not think that it would have been possible for the individuals to swap positions. She testified that the person on the bottom was bald, the one in the middle had dark hair, and the person on top "was a tall, slender guy, sort of longish hair, scraggly beard, grayish hair..." She also said that the guy in the middle kept calling the one on top of the stack "Corky". The person on top of the stack was closest to the steering wheel. Riner could not identify Turner in court.

¶9. Vicki Westmoreland was a paramedic who responded to the scene at approximately 10:30 a.m. She saw two vehicles. One was off the road and one was turned up on its side. Vicki went to the white car to help out. Other personnel were working on the driver, Mr. West, so Vicki proceeded to the truck to determine if a helicopter or other backup help was needed. Backup was called including a helicopter. Vicki returned to the white car to help with Mr. West. She determined that he had very serious injuries. As emergency personnel worked on him, he died. Vicki then returned to the truck. She described the occupant that was trapped between the truck and the ground as balding. She described the person on top of the stack as having "long, scraggly hair and a beard." The person in the middle had dark hair and a mustache, and was smaller than the other two occupants. The person on top of the stack with the long scraggly hair and beard was closest to the steering wheel. Vicki stepped on a vodka bottle by the truck, and noticed the odor of alcohol from the three people in the truck. She also saw beer cans in the area. Vicki testified that the top of the truck had to be cut off in order to rescue the three occupants. Vicki stated that the three men could move their arms around, but they could not move their bodies. She did not witness any of them swapping positions, and did not think that it would be possible. Vicki learned that the person closest to the steering wheel was named Corky Turner. She was unable to identify Turner in court.

¶10. Tommy Owens was another paramedic at the scene. When he arrived at the pick-up truck, he noticed the positions of the individuals in the truck. He testified that the person on the bottom was bald or slightly bald. He described a black headed person with a black beard as being in the middle. He stated that the person on top was tall and thin with stringy hair and a shaggy beard. The person on top was the closest to the steering wheel. Corky was the person closest to the steering wheel. Owens rode in the ambulance to the hospital with Corky Turner and Terry Moore. Owens asked them if they had been drinking. Turner said that he had and that he was an alcoholic. Owens also asked who had been driving the pick-up. Turner gave no response. Owens testified that the occupants were moving

their arms and legs, but not their complete bodies.

¶11. Terry Moore, one of the occupants of the truck, testified at trial. Moore had known Turner for about three and one half years. He identified Turner in court. Moore said that he had never seen Turner without a beard or long hair prior to trial. Moore testified that he was with Turner and Leon Umfress on Sunday, July 2, 1995. Moore testified that on the Wednesday prior to that Sunday, he had gotten off work and had started drinking. On Thursday, he got up and decided not to go to work. He went to Turner's house and picked him up. Then, they picked up Leon Umfress. The three rode around drinking. On Friday, Moore was also with Turner and Umfress. The three men went to Fulton to pick up Moore's paycheck. Afterwards, they went to the bank. Approximately two blocks from the bank, Moore was pulled over by a policeman, and charged with DUI. Moore spent the night in jail. Umfress drove Moore's pick-up home. On Saturday morning, Umfress and his father picked Moore up at the Itawamba County Jail. That afternoon, Moore and Umfress picked up Turner. Moore was driving. Turner did some of the driving on that Saturday afternoon. After picking up Turner, the three proceeded to Dago's store, where Turner cashed his check and bought a case of beer. They left from Dago's and went to Tupelo, where Turner got some groceries. They then stopped at a liquor store where Turner bought a fifth of vodka. Later that afternoon, Turner was driving when the three returned to Dago's to purchase three more cases of beer. Moore testified that he, Umfress, and Turner got drunk that night. He did not recall where they spent the night. On Sunday morning, Moore, Turner, and Umfress went to Moore's home around 6:30 or 7:00 a.m. While there, Moore changed clothes and spoke with his mother. When the three left Moore's home sometime around 7:00 a.m., Moore was driving. From there, he drove to the BP station near his home. Moore bought some gas, cigarettes, and ice. There was beer in the truck so Moore bought the ice to cool it down. When the three left the BP station, Moore was driving. He drove toward Tupelo. The last place Moore remembered being on Sunday morning was at the BP station. Moore, Turner, and Umfress were drinking in the truck. The next thing Moore remembered was waking up right before the wreck. He testified that he was seated in the middle of the truck. When he awoke he saw that they were about to hit the Wests' vehicle, and he reached over and grabbed the steering wheel in an attempt to pull the truck out of the way of the Wests' car. He was not sure whether he had actually turned the steering wheel or not. The next thing Moore remembered was Turner lying on top of him. Moore testified that he asked Turner to raise up so he could get from underneath Turner, but Turner said he could not move. Moore was then taken to the hospital, where he refused consent to allow his blood to be drawn. He testified that he told the nurse that he was not driving and there was no need for her to draw his blood. Moore testified that he did not remember stopping and turning the driving over to Turner. Moore testified that he was not driving when the accident occurred. Moore testified that Turner was the driver. He testified that he is 5'6" or 5'7". Moore testified that on the day of the accident, Turner had long grayish hair and a full beard.

¶12. William Putt was a deputy sheriff with the Lee County Sheriff's Department at the time of the accident. He was called to the scene of the accident and arrived there at approximately 11:27 a.m. Later he went to the hospital to talk to Turner and Moore. Putt asked Turner to consent to a blood test, and Turner refused. At that point, Putt returned to the sheriff's office and started working on getting a search warrant for the blood test of Turner. During that time, the hospital called and said that Turner had agreed to take the blood test. Putt returned to the hospital. He and Gwen Judon went in to talk to Turner. Putt did not remember anyone else being present in the room during this

conversation except Turner, Judon, and himself. Putt again asked Turner to consent to the blood test, and Turner consented. Judon then drew Turner's blood. Putt testified that Turner did not sign a consent form. Turner told Putt and Judon that he could not write. He gave verbal consent. The consent form was signed by Putt and Judon. The form stated that "[t]he patient is unable to consent because... states unable to write at this time but given verbal consent." Putt described Turner's appearance at the hospital. He stated that Turner had long, shoulder-length, bushy hair and a beard. Putt was unable to identify Turner in court.

¶13. Sam Howell with the Mississippi Crime Lab testified that he analyzed Turner's blood and that the blood alcohol level was 0.23%.

¶14. Wanda Shumpert, a defense witness, testified that she is a neighbor of Turner's. In the early morning of July 2, 1995, she was outside of her house when Turner, Moore and Umfress drove by. She did not know the other two men, but she knew Turner. She testified that at that time, Turner was seated in the middle of the truck. On cross-examination, Shumpert testified that she saw Turner and the others between 7:00 a.m. and 9:00 a.m. Turner had a beard and his hair was fairly long.

¶15. Amy Linton testified that she is a neighbor of Turner's. On July 2, 1995, between 8:00 a.m. and 9:00 a.m., she saw Turner and two other men that she did not know driving down the road. She testified that Turner was seated in the middle of the truck. Linton testified on cross-examination that she was positive that it was Turner that she saw in the middle because she recognized his beard and long hair.

¶16. John Gardner testified that he knew Turner, Moore, and Umfress. He saw them at the BP station on July 2, 1995 between 7:00 a.m. and 7:15 a.m. Gardner testified that Moore was driving the truck.

¶17. Richard Dobbins testified that he knew Turner. He testified that between 7:00 a.m. and 8:00 a.m. on July 2, 1995, he saw Turner and two other men at Leslie's grocery. Turner was sitting in the middle of the truck.

¶18. Frank Carroll Leslie testified that between 7:00 a.m. and 8:00 a.m., Turner and two other men came to his store. When the vehicle left his store, Turner was seated in the middle.

¶19. Faye Willis testified that she saw Turner and two other men at the R&R Cash and Carry on July 2, 1995 around 9:30 a.m. or 10:00 a.m. Turner was seated in the middle of the truck with the other men on either side of him. The other men were wearing caps.

¶20. Lamon Griggs testified as an expert in accident reconstruction for the defense. He testified that the pick-up was on the wrong side of the road when it collided with the Wests' vehicle. He saw no evidence of anyone jerking the steering wheel to try to avoid impact. Griggs testified that there was plenty of room within the cab of the pick-up for one or two people to move around.

¶21. The State called Nancy Hammond as a rebuttal witness. She testified that she had known Turner all her life. She identified Turner in court. Hammond testified that on July 1, 1995, Turner and Umfress came into her store, Dago's. She described Turner as having a "long, stringy hair, beard down to here, real rough looking." Turner left driving the truck.

¶22. The State also called Doris McCullar on rebuttal. She had known Turner for several years. She identified Turner in court. McCullar was working at Dago's on July 1, 1995 when Turner came in. Turner did not look the same in court as he did on that day. McCullar testified that on July 1, 1995, Turner had a long beard and long hair. When the three men left the store, Turner was driving the truck.

¶23. Turner appeals from the jury verdict convicting him of DUI resulting in death. He assigns as error the following issues for this Court's review:

**I. WHETHER SUFFICIENT EVIDENCE WAS PRESENTED TO CONVICT TURNER ON THE INDICTED CHARGE.**

**II. THE COURT ERRED IN ALLOWING THE INTRODUCTION OF THE BLOOD ALCOHOL REPORT OVER THE OBJECTION OF THE DEFENDANT WHERE THE PROSECUTION DID NOT LAY THE PROPER FOUNDATION FOR INTRODUCTION AND VIOLATIVE OF THE FOURTH AMENDMENT.**

**III. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR DIRECTED VERDICT, BOTH AT THE CLOSE OF THE STATE'S CASE AND AT THE CLOSE OF THE ENTIRE CASE, AND IN DENYING MOTION FOR JNOV, OR IN THE ALTERNATIVE, A NEW TRIAL.**

**IV. THE COURT ERRED IN NOT GIVING A CIRCUMSTANTIAL EVIDENCE INSTRUCTION.**

**V. THE EVIDENCE PRESENTED PROVED TO BE INSUFFICIENT WHERE GREAT RELIANCE WAS PLACED ON THE UNCORROBORATED INCREDIBLE TESTIMONY OF TERRY MOORE.**

**VI. WHETHER THE TRIAL COURT ERRED IN CHARGING THE JURY TO RESUME DELIBERATIONS ON TWO SEPARATE OCCASIONS WHERE THEY EXPRESSED THAT THEY WERE DEADLOCKED.**

**VII. THE COURT ERRED CONCERNING THE OVERRULING OF MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF OFFICER CONCERNING THE POSITION OF OCCUPANTS AND ERRED IN NOT GRANTING MOTION FOR CONTINUANCE.**

**VIII. THE COURT ERRED BY NOT ALLOWING DEFENDANT TO PRESENT ITS THEORY THROUGH THE OPINION TESTIMONY OF ACCIDENT RECONSTRUCTIONIST EXPERT AND ERRED IN NOT GRANTING CONTINUANCE.**

**IX. THE COURT ERRED IN FAILING TO SUSTAIN DEFENDANT'S MOTION TO DISMISS INDICTMENT BASED ON CONSTITUTIONAL INFIRMITIES.**

<u>ANALYSIS</u>

## ISSUES I, III, & V

¶24. Turner's contends in Issue I that the evidence was legally insufficient on the issue of whether Turner was driving the pick-up at the time of the accident. In Issue III, Turner asserts that the trial court erred in denying his motions for directed verdict, his motion for j.n.o.v., and his motion for new trial. In Issue V, Turner contends that the evidence was legally insufficient because Terry Moore's testimony was not credible. As the State points out in its brief, it appears that Turner's contention goes more to the weight and credibility of Moore's testimony than to the legal sufficiency.

¶25. In summary, Turner is contesting both the legal sufficiency and the weight of the evidence at trial. The legal sufficiency argument is an assignment of error to the trial court's denial of Turner's motions for directed verdict, which were renewed post-trial in his motion for j.n.o.v. The weight of the evidence argument is an assignment of error to the trial court's denial of the motion for new trial. Both the legal sufficiency and weight of the evidence arguments involve the same factual issue which is who was driving the pick-up when the wreck occurred. Therefore, we will address Turner's Issues I, III, and V in conjunction with one another.

## 1. Legal Sufficiency

¶26. Miss. Code Ann. § 63-11-30(4) (1996) provides that:

> Every person who operates any motor vehicle in violation of the provisions of subsection (1) of this section and who in a negligent manner causes the death of another or mutilates, disfigures, permanently disables or destroys the tongue, eye, lip, nose, or any other limb, organ or member of another shall, upon conviction, be guilty of a felony and shall be committed to the custody of the State Department of Corrections for a period of time not to exceed twenty-five (25) years.

¶27. Subsection (1) of Miss. Code Ann. § 63-11-30 (1996) provides, in pertinent part, that:

> It is unlawful for any person to drive or otherwise operate a vehicle within this state who (a) is under the influence of intoxicating liquor;....(c) has ten one-hundredths percent (.10%) or more...

The elements of the crime of DUI resulting in death are therefore, (1) operating a vehicle while under the influence of intoxicating liquor or with a blood alcohol level of .10% or more; and (2) causing the death of another in a negligent manner. *Hedrick v. State,* 637 So. 2d 834, 837-38 (Miss. 1994).

¶28. Turner's contention is that the State failed to prove beyond a reasonable doubt that he was the driver of the pick-up when the accident occurred. The standard of review for Turner's legal sufficiency argument, wherein he argues the trial court erred in denying his motions for directed verdict and his motion for j.n.o.v., is:

> Where a defendant has requested a peremptory instruction in a criminal case or after conviction moved for a judgment of acquittal notwithstanding the verdict, the trial judge must consider all of the evidence--not just the evidence which supports the State's case.... The evidence which supports the case of the State must be taken as true... The State must be given the benefit of all favorable inferences that may reasonable be drawn from the evidence... If the facts and inferences so considered point in favor of the defendant with sufficient force that reasonable

men could not have found beyond a reasonable doubt that the defendant was guilty, granting the peremptory instruction or judgment n.o.v. is required. On the other hand, if there is substantial evidence opposed to the request or motion--that is, evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair minded men in the exercise of impartial judgment might reach different conclusions the request or motion should be denied.

*Weeks v. State,* 493 So. 2d 1280, 1282 (Miss. 1986)(citing *Gavin v. State,* 473 So. 2d 952, 956 (Miss. 1985)). The facts of this case were discussed fully at the outset of this opinion. Terry Moore testified that Turner was driving the vehicle at the time of the accident. Numerous rescue workers testified that Turner was located on top of the stack, closest to the steering wheel, and that the occupants of the truck were not able to move around inside the truck. We hold that trial court did not err in denying Turner's motions for directed verdict and his motion for j.n.o.v. The State presented substantial evidence that Turner was the driver of the pick-up at the time of the accident such that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions. This is all that is required of the State, and the trial court was not in error. Additionally, Turner waived the trial court's consideration of the denial of his motions for directed verdict when he presented evidence in his own behalf. *Ruffin v. State,* 481 So. 2d 312, 316 (Miss. 1985).

## 2. Weight of the Evidence

¶29. Turner contends that the jury verdict was against the overwhelming weight of the evidence. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Herring v. State,* 691 So. 2d 948, 957 (Miss. 1997)(citing *Thornhill v. State,* 561 So. 2d 1025, 1030 (Miss. 1989)). "Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Herring,* 691 So. 2d at 957(citing *Benson v. State,* 551 So. 2d 188, 193 (Miss. 1989)). "In reviewing this claim, this Court must accept as true the evidence favorable to the State." *Wetz v. State,* 503 So. 2d 803, 812 (Miss. 1987)(citing *Van Buren v. State,* 498 So. 2d 1224, 1228 (Miss. 1986)). "[W]here there is conflicting testimony, the jury is the judge of the credibility of the witnesses." *Wetz,* 503 So. 2d at 812 (citations omitted).

¶30. As the State notes in its brief, Turner focuses on the testimony of Terry Moore and the defense witnesses that Terry Moore had been driving the pick-up truck on the morning of the accident. As the State argues, even if those facts are true, they do not impel the conclusion that Terry Moore was driving when the accident occurred. The latest that any witness saw Terry Moore driving the truck was at 9:30 a.m. or 10:00 a.m. Each of those witnesses agreed with the State that he had no idea who was driving the truck at the time of the wreck. The accident occurred at 10:30 a.m. Terry Moore testified that he was not driving the pick-up when the accident occurred. The Sheffields testified that the person driving had long, scraggly, unkempt hair. Numerous rescue workers testified that the person on top of the stack and closest to the steering wheel was the person with long hair and a beard, and that the person in the middle of the stack kept calling the person on top of him, "Corky."

¶31. We hold that the trial court did not err in denying Turner's motion for a new trial and that the

verdict in this case was not against the overwhelming weight of the evidence. Accepting all of the evidence favorable to the State as true, it cannot be said that the trial court abused its discretion in this case. Turner's assignments of error as to the legal sufficiency of the evidence and the weight of the evidence in Issues I, III, and V are meritless.

**ISSUE 2**

**Error in admitting blood alcohol report**

¶32. Turner contends that it was error for the trial court to admit into evidence the blood alcohol report which showed that Turner had a blood alcohol level of .23 several hours after the wreck. Turner asserts that the report was more prejudicial than probative. He also asserts that his Fourth Amendment right against unreasonable searches and seizures was violated because he did not sign a consent form, and therefore there was no consent..

¶33. Turner cites to this Court's decision in *Wade v. State,* 583 So. 2d 965, 967 (Miss. 1991) to support his position that "[w]hen the introduction of evidence prejudices defendant, it constitutes reversible error." This is a misstatement of the law. Reversible error occurs only where the ***improper introduction*** of evidence prejudices the defendant. *Wade,* 583 So. 2d at 967 (emphasis added). The question for this Court is whether the blood alcohol report was improperly admitted, i.e., was there consent for the blood to be drawn? The results of the blood test are clearly admissible at trial under Miss.R.Evid. 401, so long as Turner was not subjected to an unreasonable search without his consent. *Whitehurst v. State,* 540 So. 2d 1319, 1322-23 (Miss. 1989).

¶34. Turner cites no authority whatsoever to support his position that his verbal consent to the drawing of his blood was insufficient. This Court is under no obligation to consider this assignment of error. *Brown v. State,* 534 So. 2d 1019, 1023 (Miss. 1988).

¶35. The trial court conducted a hearing on Turner's motion to suppress the blood alcohol test. Elizabeth Jordan, Turner's sister, testified that she was present when Turner's blood was drawn for the blood test and that she never heard anyone talk to Turner about consent. Officer Putt testified that he was present with Gwen Judon when Turner gave verbal consent to the blood test. He also testified that Elizabeth Jordan was not in the room when Turner gave consent. The trial court overruled the motion to suppress. At least part of the trial court's ruling was based on Miss. Code Ann. § 63-11-8 (1996) which mandates that the operator of any motor vehicle involved in an accident that results in a death shall be tested for his blood alcohol content, and that those results may be used as evidence in any court without the consent of the person tested. Miss. Code Ann. § 63-11-8(1) & (3) (1996). However, that statute did not become effective until July 2, 1996. The accident and death occurred in this case on July 2, 1995.

¶36. We find that the trial court in its discretion, determined that Turner had consented to the blood alcohol test. This Court gives deference to that ruling. Moreover, the results of the test were admissible at trial under Rules 401 and 403 of the Mississippi Rules of Evidence. This Court, in *Ashley v. State,* 423 So. 2d 1311 (Miss. 1982), explained this Court's interpretation of search and seizure law as it applies to blood alcohol searches.

We first address appellant's Fourth Amendment claims. The United States Supreme Court in

*Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) held that taking blood samples from a defendant who had been lawfully arrested did not violate his Fourth Amendment rights. In *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) the Court held that taking fingernail scrapings from one detained did not violate his Fourth Amendment rights where probable cause for his arrest existed. The *Cupp* rationale has been extended in some jurisdictions to include the warrantless taking of a suspect's blood for analysis prior to arrest where probable cause existed and the circumstances dictated that the blood should be taken for a test. *Aliff v. State,* 627 S.W.2d 166 (Tex.Cr.App. 1982); *State v. Campbell,* 615 P.2d 190 (Mont. 1980); *State v. Oevering,* 268 N.W.2d 68 (Minn. 1978).

We find appellant had not been lawfully arrested when his blood was withdrawn for testing. However, our examination of the facts must not stop here. We must determine whether Officer Santacruz had probable cause to detain appellant and order a blood test after he went to the hospital. The facts in possession of the officer at that time were that Ashley was driving an automobile which had run into the rear end of another automobile which was stopped at a traffic signal, that an occupant of the stopped automobile had been killed in the accident, and in the opinion of the officer appellant was intoxicated. Under these facts the officer could then have arrested appellant on a charge of manslaughter and required appellant to submit to a test to determine the alcoholic content of his blood. At that time there existed probable cause for arrest and also probable cause to search appellant by requiring him to submit to the withdrawal of blood from his body to be tested.

....

The United States Supreme Court recognized in *Schmerber, supra,* that extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. It also recognized, as this Court did in *Jackson v. State,* 310 So. 2d 898 (Miss. 1975), that the percentage of alcohol in the blood begins to diminish shortly after drinking stops as the body functions to eliminate alcohol from the system.

Information gathered at the accident scene and later at the hospital not only provided probable cause for appellant's arrest, but also indicated that appellant was probably intoxicated; hence, the need for a blood test. Under the facts of this case, we hold that appellant's Fourth Amendment rights were not violated, and the result of the blood test administered at the direction of Dr. Wiggins was admissible in evidence. We hold that, where the state is justified in requiring a blood test to determine the alcoholic content in a suspect's blood, and such test has in fact been performed, although for diagnostic and not law enforcement purposes, the state is entitled to the benefit of the test results....

*Ashley v. State,* 423 So. 2d 1311, 1313-14 (Miss. 1982). In the case *sub judice,* Officer Putt certainly had probable cause to arrest Turner at the hospital. Under *Ashley,* he could have taken Turner's blood for testing even without consent. We hold that there was no error in the trial court's denial of Turner's motion to suppress.

## ISSUE IV

### Error not to give circumstantial evidence instruction

¶37. Turner argues that it was error for the trial court to refuse to give a circumstantial evidence instruction in this case. He contends that there was no eyewitness or direct evidence identifying him as the driver of the truck.

¶38. Clearly, Terry Moore was an eyewitness. Turner argues that Moore was drunk and could not remember certain events on the day of the accident. As the State argues, these were factors for the jury to consider in assessing the weight and worth of Moore's testimony, but they do not change the fact that Moore was an eyewitness. Moore testified that Turner was driving the truck.

¶39. "The rule in Mississippi is that a circumstantial evidence instruction should be given only when the prosecution can produce neither eyewitnesses or a confession to the offense charged." **Stringfellow v. State,** 595 So. 2d 1320, 1322 (Miss. 1992). This assignment of error is meritless.

## ISSUE VI

### Error in requiring the jury to continue deliberations

¶40. The jury in this case retired to deliberate its verdict at 10:55 a.m. The jury returned to the courtroom at 2:02 p.m. At that point, the court asked for the numerical division of the jury and instructed the jury to not tell him which way it was divided. The jury announced that it was divided 8 to 4. The court asked, "Is there a possibility that you all can reconcile your differences and resolve this matter if you had additional time?" One juror responded, "Yes, sir." The trial court then read verbatim to the jury the **Sharplin** charge, and the jury returned to deliberate at 2:05 p.m. **Sharplin v. State,** 330 So. 2d 591, 596 (Miss. 1976). At 3:10 p.m., the jury again returned to the courtroom and announced that it was divided by a vote of 9 to 3. The court again asked the jury, "Is there any possibility of you reconciling your differences and reaching a decision in this case?" All jurors responded with affirmative nods. The court then said, "If you all feel that you can resolve it, I'm going to ask that you continue your deliberations." The jury returned to deliberate at 3:14 p.m. The jury returned to the courtroom at 4:43 p.m. and announced its verdict of guilty.

¶41. It appears that Turner is arguing that the court erred the second time he sent the jurors back to deliberate because he did not recharge the jury.

¶42. The trial court committed no error here. There is no error in asking the jury for its numerical division without reference to guilt or innocence. **Sharplin,** 330 So. 2d at 596. Additionally, the first time the trial court sent the jury back to deliberate, he read the approved charge verbatim from **Sharplin.** The second time the trial court sent the jury back, he did not reread the **Sharplin** charge. However, this was not error. In **Sharplin,** this Court said,

> If the trial judge feels that there is a likelihood that the jury might reach a verdict, he may return the jury for further deliberations by simply stating to the jurors: 'Please continue your deliberations,' **or** he may give the following instruction...

**Id.** at 596(emphasis added). Although the trial court did not recharge the jury with the **Sharplin** charge, he only asked them to continue their deliberations, which is sufficient under **Sharplin.** This assignment of error is meritless.

# ISSUE VII

## Error in overruling motion in limine

¶43. Turner assigns as error the trial court's denial of his oral motion in limine to prohibit the investigating police officers from stating their opinions as to who was driving the pick-up truck. Before the start of the trial, the State moved in limine to exclude the testimony of the defense's expert accident reconstructionist from giving an opinion as to who the driver of the truck was. That motion was granted. Subsequently, the defense moved in limine to exclude any investigating police officers from stating their opinions as to who was driving the truck. The following exchange occurred:

MR. FARRELL: Your Honor, in that connection, then, will the Court permit police officers to testify as to their opinion as to who was closest to the steering wheel or who was driving or anything of that nature?

MR. FARRIS: Your Honor, that's just pure fact, who was closest to the steering wheel and who was on top of the pile.

THE COURT: They can testify what they visually observed. They were there. I'm going to allow them to testify as to that.

MR. FARRELL: Will any statements or any testimony be allowed, Your Honor, with regard to their opinion as to who was driving?

THE COURT: Any statement about the opinion?

MR. FARRELL: Whether the Court will permit testimony from the police officers with regard to their opinion as to who was driving.

THE COURT: Did they investigate?

MR. FARRELL: Pardon me?

THE COURT: Did they investigate?

MR. FARRELL: Yes, Your Honor.

THE COURT: If they investigated, I'm going to allow them to make reasonable opinions associated with the investigation if they were out there. I'm going to allow them to do that.

.....

THE COURT: If they took a statement along those lines, I'm going to allow them to do it. You are asking me just carte blanche just say that I'm not going to allow them to do it, and I don't know the entire circumstances behind it, Mr. Thorne. If they get on there and they've got sufficient background information to substantiate that they can make a determination as to who was driving, I'm going to allow them to do it, but if it has no basis and they are just speculating, then that's an entirely different story. I can't carte blanche say that I'm not going to let them do it now, because I don't know the facts or circumstances from what they are going to testify to,

and that's what you are asking me to do. You are asking me to say at this point that they are not going to be able to give an opinion, and I don't know what they are going to testify to. But I do know that based upon his motion in limine that what you are asking me to allow your expert to do is to say that this expert can come into this courtroom and give an opinion as to where everybody was seated in that truck based upon what the injuries were and based upon what the doctor's report was, and I'm not going--

MR. THORNE: No, sir, not based strictly on the doctors reports. It's based on all of the information that has been accumulated and provided to us through discovery and his own investigation, looking at the scene, looking at the vehicles and the doctors' reports in addition to that.

THE COURT: Okay. Well, at this time if you were making an oral motion in limine to exclude any testimony from the police officers, that motion will be overruled at this time. Basically because I don't know what they are going to testify to, if they have an opinion....

¶44. This assignment of error by Turner focuses on the testimony of Officer William Putt. Turner does not point to any specific objectionable testimony in his brief. The State assumes, as does this Court, that Turner complains of the following testimony;

Q Now, Mr. Putt, at that point in time was it your opinion that Corky was the driver of that vehicle?

A Yes, sir, it was.

MR. THORNE: Your Honor, object to that. Calls for his opinion. He's not qualified to give that type of opinion.

THE COURT: The objection is overruled.

Q And what did you base your conclusion on?

A The statements from the EMTs.

Turner argues that Putt was a lay witness and not an expert, and that therefore he could not testify as to the cause of the accident or who was driving at the time of the accident. Turner also argues that Putt's testimony does not satisfy the requirements of Miss.R.Evid. 701 for lay witness opinion testimony.

¶45. The State counters that it is clear from a reading of the record that Putt was not testifying as an expert. The record reveals that Putt was being questioned by the State as to his belief that he had probable cause to obtain a search warrant for Turner's blood after Turner refused to submit to a blood alcohol test. The questions leading up to this statement by Putt all dealt with the facts supporting Putt's determination that there was probable cause for a search warrant for Turner's blood, but not for Terry Moore's. Turner insists that Putt was really giving expert testimony in the form of accident reconstruction. The record belies that assertion.

¶46. The question is whether this statement was proper lay witness opinion testimony. Rule 701 of the

Miss.R.Evid. provides that:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.

Putt's statement does not appear to meet the requirements of the rule. First, his opinion was based on the perceptions of the EMTs, and not his own. Second, his opinion invaded the province of the jury to determine who was the driver of the truck. However, the opinion did help the jury to understand why Putt believed he had probable cause to obtain a search warrant for Turner's blood, and why he did not believe that he had probable cause to obtain a search warrant for Moore's blood.

¶47. Although the trial court erred in allowing this testimony, this Court holds the error harmless. In **Whittington v. State,** 523 So. 2d 966, 974-75 (Miss. 1988), a lay witness police officer was permitted to express his opinion that at the time of his investigation, he did not think the victim died in the car wreck. Although this was the defendant's theory of defense, this Court held that the error was harmless because the Court found that the officer's statement was no more than an expression that his suspicion was aroused following his investigation at the scene. **Whittington,** 523 So. 2d at 975. The Court reasoned that the jurors already knew that the investigating officers were suspicious, or else the investigation would not have continued. The Court found that it would have been a much more serious question if the officer had been asked and permitted to testify that, at the time of trial, he did not believe the victim was killed in the wreck. **Id.** Finally, the Court found the error cured by the fact that an expert testified after the officer and, in great detail, explained why in his opinion he did not believe the victim was killed in the accident. **Id.**

¶48. In the case *sub judice,* as in **Whittington,** the jurors already knew that Putt suspected Turner to be the driver because he did not pursue an effort to obtain Moore's blood. Additionally, Putt's testimony was followed by Terry Moore's testimony in which he testified directly that Turner was the driver. Therefore, we hold that any error was cured, as it was in **Whittington.**

## ISSUE VIII

### Error in limiting opinion of defense expert witness

¶49. Turner argues that it was error for the trial court not to allow his expert accident reconstruction witness, Lamon Griggs, to testify as to the position of the occupants in the truck. The trial court, after reviewing Griggs' curriculum vitae, ruled that he would not be allowed to testify as to the positions of the occupants in the truck or to who was driving the truck. The court found that Griggs had no expertise in that area. After Griggs' testimony at trial, the defense proffered his opinion as to the positions of the occupants in the truck and as to who was driving. He opined that Terry Moore was driving the truck at the time of the accident. The trial court stated;

> Let the record reflect that the Court refused to allow this testimony, that the Court accepted this witness as a witness in the field of accident reconstruction, that based upon that -- allowing him to do that, the Court was of the opinion that to allow this testimony was outside his area of expertise and that I would not allow that testimony, because I was of the opinion that he was

not a physicist. And because he was not qualified in the area to establish who was the driver of the automobile, I would not allow that in evidence.

.....

In addition, the Court did not allow him to testify as to injuries received by the occupants of the vehicle based upon the fact that he's not a medical doctor.

¶50. This Court has said that, "[t]he admission of expert testimony is addressed to the sound discretion of the trial judge. Unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." *Seal v. Miller,* 605 So. 2d 240, 243 (Miss. 1992)(citing *Hooten v. State,* 492 So. 2d 948, 950-51 (Miss. 1986)(citing *Weiss v. Louisville, N.O. & T. Ry. Co.,* 7 So. 390 (1890))). Turner does not assert in his brief that the trial court erred in ruling that his expert was unqualified to testify as to the driver of the truck. Rather, he asserts that because William Putt was allowed to give his "expert" opinion as to the driver of the truck, Turner should have been allowed to have his expert rebut Putt's opinion. Turner claims his case was prejudiced in that he was not allowed to present his theory of defense.

¶51. The trial court was completely within its discretion to determine that Griggs was not qualified to give this opinion. First, as discussed in Issue VII, Putt was not giving expert testimony in the form of accident reconstruction testimony. Second, Turner has cited no authority nor made any argument in support of his quid pro quo argument. Turner argues that defendants are allowed to present every lawful defense available to them, and that his right in this area was restricted. While this basic premise may be true, the trial court was not required to allow Turner's expert to testify in areas that the court found him lacking in expertise. Turner could have and did present his theory through other witnesses. The jury was well aware that Turner's contention was that he was not the driver of the truck, and that Moore was. This assignment of error is meritless, and Turner suffered no prejudice.

## ISSUE IX

### Constitutionality of Miss. Code Ann. § 63-11-30(4)

¶52. Turner assigns error to the trial court's denial of his motion to dismiss the indictment, contending that Miss. Code Ann. § 63-11-30(4) is unconstitutional. He argues that the statute is vague, ambiguous, and overbroad because it does not define a degree of negligence necessary to be guilty of the felony, whereby the statute provides insufficient notice of the prohibited conduct. Turner also argues that the statute is unconstitutional because it does not provide that contributory or comparative negligence is a defense to a criminal prosecution. Finally, he argues that the statute is unconstitutional because it provides for a more severe penalty than that provided for culpable negligence manslaughter.

### Vagueness

¶53. Turner argues that Miss. Code Ann. § 63-11-30(4) is vague because it does not define the degree of negligence necessary to violate the statute. He argues that negligence is defined in many different ways, and that therefore the statute gives inadequate notice.

¶54. This Court has said that simple negligence is sufficient for a conviction under Miss. Code Ann. §

63-11-30(4). ***Holloman v. State,*** 656 So. 2d 1134, 1140 (Miss. 1995). Also in ***Holloman,*** we said that only simple negligence is required by the statute, not culpable or gross negligence. ***Holloman,*** 656 So. 2d at 1140(simple negligence jury instruction was appropriate.) Negligence is defined as "failure to exercise reasonable care under the circumstances." ***Smith v. City of W. Point,*** 475 So. 2d 816, 818 (Miss. 1985)(citing ***Cole v. Delchamps, Inc.,*** 246 Miss. 846, 152 So. 2d 911, 913 (1963)).

¶55. In ***Mayfield v. State,*** 612 So. 2d 1120, 1128 (Miss. 1992), this Court rejected a similar argument concerning Miss. Code Ann. § 97-3-47 (1994). The appellant in that case argued that the culpable negligence manslaughter statute was vague because it did not set out what activities constituted culpable negligence. This Court found that the appellant's argument was meritless in view of the numerous decisions defining culpable negligence. Similarly, this Court rejects Turner's argument that Miss. Code Ann. § 63-11-30(4) is vague in view of the numerous decisions of this Court defining negligence.

### Contributory or comparative negligence as a defense

¶56. Turner asserts that the statute is unconstitutional because it does not provide for a defense of contributory or comparative negligence. However, Turner cites no authority for his contention and fails to make any argument whatsoever. This Court is not required to consider this assignment of error. ***Brown v. State,*** 534 So. 2d 1019, 1023 (Miss. 1988). Furthermore, Turner has no standing to make this argument as there was absolutely no proof at trial that Mr. West was in any manner contributorily negligent.

### Punishment

¶57. Finally, Turner argues that the statute is unconstitutional because it provides for a more severe penalty than that provided for culpable negligence manslaughter. Turner focuses his argument on the contention that negligence is less condemnable than culpable negligence. Turner ignores the fact that Miss. Code Ann. § 63-11-30(4) requires proof of intoxication in addition to negligence.

¶58. This Court has said, "[t]he power to determine appropriate punishment for criminal acts lies in the legislative branch." ***Fisher v. State,*** 690 So. 2d 268, 275 (Miss. 1996). The State correctly points out that when the Legislature increased the penalty for DUI causing death to a maximum of twenty-five years, DUI resulting in death ceased to be a lesser-included offense of manslaughter. This assignment of error is unsupported by authority or argument. Furthermore, it is meritless.

### CONCLUSION

¶59. This Court holds that no reversible error occurred in this case, and we affirm the verdict of the jury finding Turner guilty of DUI resulting in death.

¶60. **CONVICTION OF DUI-DEATH AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. APPELLANT SHALL PAY COURT COSTS AND MAKE RESTITUTION OF $7,415.00 FOR FUNERAL EXPENSES.**

**PRATHER, C.J., SULLIVAN, P.J., BANKS, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., NOT PARTICIPATING.**