754 So.2d 476 (1999)
Jeffrey JONES a/k/a Jeffrey Earl Jones a/k/a Jeff Jones, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-00781-COA.
Court of Appeals of Mississippi.
July 20, 1999.
Rehearing Denied October 26, 1999.
Certiorari Denied January 27, 2000.
*477 Thomas M. Fortner, Robert M. Ryan, Andre' De Gruy, Jackson, Attorneys for Appellant.
Office of the Attorney General by Charles W. Maris, Jr., Attorney for Appellee.
BEFORE KING, P.J., BRIDGES, AND LEE, JJ.
BRIDGES, J., for the Court:
¶ 1. Appellant Jeffrey Jones and his codefendant, Daryl L. Naylor, were indicted for "wilfully, unlawfully, feloniously and knowingly possess[ing] cocaine with intent to distribute same" by a Hinds County grand jury. The indictment was later amended to reflect an enhancement to the *478 crime charged because Jones had three firearms in his possession at the time of the alleged offense. A jury in the Circuit Court of the First Judicial District of Hinds County found Jones guilty as charged, and the judge sentenced him to fifteen years in the custody of the Mississippi Department of Corrections, with twelve years suspended, three years to serve, and three years of supervised probation.
¶ 2. Jones appeals, presenting for our review three assignments of error:
1. THE TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR BY ALLOWING DETECTIVE STEVE RENFROE TO RENDER EXPERT TESTIMONY BEFORE THE TRIAL JURY WITHOUT HAVING BEEN OFFERED, TENDERED OR ACCEPTED AS AN EXPERT IN ANY FIELD IN VIOLATION OF RULE 702, MISSISSIPPI RULES OF EVIDENCE.
2. THE TRIAL COURT ERRED IN REFUSING TO QUASH THE JURY VENIRE WHERE EIGHTEEN OF THE THIRTY-EIGHT MEMBERS HAD CLOSE TIES TO THE PROSECUTION.
3. THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN A CONVICTION FOR POSSESSION WITH INTENT TO DISTRIBUTE.
¶ 3. We resolve these issues adversely to Jones and affirm the jury's verdict.

I. FACTS
¶ 4. We recite the facts from the perspective consistent with the verdict.
¶ 5. On December 19, 1995, police entered Jones's home at 2311 Woodlawn Street for the purpose of executing a search warrant for controlled substances. As officers approached the house intending to surprise the occupants and prevent disposal of evidence, they noticed a person peering from the window and realized that they had been observed. Four officers charged through the back door at the same time that four officers entered the front door, and the officers loudly identified themselves as police officers.
¶ 6. Upon entering, officers at the rear of the house heard the sound of a toilet flushing. Detective Steve Wilson entered the bathroom where he found Naylor, fully clothed, standing in the bathtub. Jones, wearing only underwear, seemed to be trying to flush the contents of a plastic bag in the toilet. As Detective Wilson attempted to move Jones away from the toilet, Jones jumped toward a window above the tub. Detective Wilson stepped into the bathtub to try to prevent Jones from tossing the plastic bag out of the window. He then instructed Officer Steve Renfroe to go outside and retrieve the bag. Meanwhile, Officer Richard Nations entered the bathroom and assisted Detective Wilson in securing the suspects. At some time during that effort, the shower was activated, and the four men in the bathtub were drenched with water.
¶ 7. From the ground outside the window, Sergeant Renfroe recovered a soggy plastic bag containing a white substance. During a thorough search of the residence, officers recovered a cable bill confirming Jones as the occupant of the residence; two loaded handguns; a shotgun; ammunition for the three weapons; two sets of walkie talkies; a metal detector; cash money; and scales. The substance in the plastic bag recovered by Sergeant Renfroe was determined to be crack cocaine.

II. TRIAL

A. PRE-TRIAL MOTIONS
¶ 8. Prior to trial, the defendants moved to dismiss the indictment, asserting that the enhancement language resulted from prosecutorial vindictiveness after the defendants refused to accept a plea bargain, and a motion in limine to prevent the prosecution from mentioning that officers *479 recovered guns from the residence. The motions were overruled. The defense moved to prohibit the prosecution from presenting evidence about a confidential informant, and the court overruled the motion but reserved further ruling on the issue until the prosecution sought to adduce that evidence.
¶ 9. The co-defendants requested additional peremptory challenges, asserting that requiring them to agree upon only six was unconstitutional. The court overruled that motion as well as Jones's motion to sever. The court sustained Jones's motion in limine to exclude evidence of other alleged crimes regarding a possibly stolen weapon and possession of drug paraphernalia by an unnamed occupant of Jones's house at the time of the search. However, the court noted that the State might be allowed to present such evidence if it became an integral part of the proof.

B. JURY SELECTION
¶ 10. In a bench conference after the court's initial voir dire, Jones moved to quash the jury panel on the grounds that the potential jurors might be confused by one venire member's statement that her brother was convicted of a similar crime and sentenced to two years' incarceration. Noting that the defendants could be sentenced to as long as sixty years, Jones asserted that the jurors might not take their responsibility seriously enough. The motion was overruled.
¶ 11. During voir dire, the defense asked the venire about connections to law enforcement. Five potential jurors were previously or currently law enforcement officers. Five others had close relatives who were in law enforcement. Several members of the venire noted that they knew people in the police department, sheriffs office, the Federal Bureau of Investigation, or the Internal Revenue Service. One venire member explained that, as a city official, she voted on the salaries of all employees of the City of Jackson. When asked whether they could be fair in the case in spite of law enforcement connections, the venire members collectively indicated that they could be fair.
¶ 12. The defense also asked whether any potential jurors were related to someone in the field of prosecution. One person had a cousin in a district attorney's office, and one person had a daughter who interned in a district attorney's office in Georgia. One venire member was a lawyer but not a prosecutor, and several others were employed by, or related to, non-prosecutor lawyers.
¶ 13. Citing Mhoon v. State, 464 So.2d 77 (Miss.1985), Jones moved to have the venire quashed because he estimated that eighteen of the thirty-eight potential jurors had close ties to law enforcement. The court overruled the motion and proceeded with jury selection. The defendants objected that they should not be required to agree on peremptory challenges. After the court noted that the defendants only used five of the six peremptory challenges allowed, Jones explained that using the sixth strike would have brought up another juror whom they wanted to challenge.
¶ 14. The court consulted the attorneys to be sure that the defendants were informed of the plea bargain offer, the maximum sentence of sixty years, and the requirement that they serve eighty-five per cent (85%) of the sentence. The jury was seated. During the State's opening argument, the defense objected on the grounds of relevancy to the State's reference to the firearms and drug paraphernalia recovered inside Jones's house. Because the drug paraphernalia supposedly did not belong to either defendant, Jones moved for a mistrial. The motion was overruled.

C. THE STATE'S CASE
¶ 15. Officer Steve Wilson, a detective with the Jackson Police Department assigned to the Jackson-Hinds Drug Enforcement Unit, testified that a city search warrant was obtained based upon information that controlled substances could be found in Jones's residence. After a team *480 was assembled to execute the warrant, the officers divided into two groups. Detective Wilson, Officer Richard Nations, Sergeant Steve Renfroe, and Officer John Norman were assigned to enter the house through the rear door while Officers Amundson, McGowan, Cox, and McCurley would enter the front door. The officers would try to take the inhabitants by surprise so that they would have no opportunity to destroy contraband or to arm themselves. By entering both doors simultaneously, the officers could secure the inhabitants quickly and prevent them from exiting the house.
¶ 16. Detective Wilson said that the inhabitants of Jones's house became aware that the police were approaching when an individual looked out the front window. According to standard procedure, the officers announced their purpose upon entering the residence. As he entered, Detective Wilson heard "what sounded like a toilet flushing" and suspected that contraband was being destroyed. He pushed open the partially closed door to the bathroom and observed the suspects. Naylor, fully clothed, was jumping into the bathtub behind the partially drawn curtain, and Jones, wearing only his underwear, was kneeling on the floor in front of the toilet. Detective Wilson described the scene as follows:
He [Jones] had his right hand in the toilet shaking a plastic bag. He had his left hand on the handle trying to make the toilet flush, and the toilet tank hadn't filled back up with water from when I heard it flush the time before, therefore, it wouldn't flush, and he was just shaking the handle and shaking the bag in the toilet like this.
¶ 17. Detective Wilson said that he tried to pull Jones away from the toilet, but Jones "continued to try to flush the commode and shake the bag." When Detective Wilson pushed him away from the toilet, Jones jumped into the bathtub toward the open window, and Detective Wilson tried to pull Jones away from the window by his necklace. Jones "stuck his hand through the window and dropped the plastic bag out the window that he had been trying to shake [loose] in the toilet."
¶ 18. As Officer Nations helped him restrain the subjects, Detective Wilson instructed Sergeant Renfroe to go outside and retrieve the plastic bag from under the window, which was seven or eight feet above the ground. Sergeant Renfroe yelled from outside when he recovered the bag and returned with the plastic bag which Detective Wilson described as "full of water as if it had come out of the toilet." It contained a white substance that appeared to be soggy crack cocaine. Detective Wilson explained that while he, Officer Nations, and the two defendants were in the bathtub, "water started pouring down out of the shower, but that was after the bag had been dropped out the window."
¶ 19. Detective Wilson described the layout of the house and said that the officers secured three people in the house besides Jones and Naylor. Detective Wilson identified the .380 from Davis Industries, the.38 Taurus, and the 12-gauge Mossburg shotgun which were recovered from the bedroom during the search. Specifically, the shotgun was found under the bed, and the .38 caliber Taurus was under a roll-away bed mattress at the head of the bed. Detective Wilson identified the ammunition for the three guns and testified that the handguns were loaded. He found a wallet in the bedroom closet which included Naylor's identification, and other officers recovered identification from Jones. Detective Wilson identified the defendants as the two subjects who were apprehended.
¶ 20. On cross-examination, Detective Wilson said that the officers entered the house with their weapons drawn and that he aimed his gun at Naylor in the bathtub as he was trying to prevent Jones from dropping the plastic bag out of the window. He did not recall seeing Mr. Naylor *481 holding any hair clippers.[1] He clarified that the ammunition for the shotgun was recovered from a car outside the house. In response to Jones's inquiry, Detective Wilson stated that he had been working in narcotics "[o]ff and on for about twelve years." After Jones asked Detective Wilson's to answer, based upon his experience, questions about crack cocaine, Detective Wilson explained that crack can be sold by rock size or by weight.
¶ 21. Detective Wilson detailed that the officers conducted the search about 12:30 p.m. when there was plenty of light. He noted that the inventory list of items recovered from the house did not include any hair clippers. He testified that the scales removed from the house were commonly used by narcotics users and dealers and that other items recovered could also be characterized as "tools of the narcotics trade."
¶ 22. The State called Sergeant Steve Renfroe. He stated that he had been with the Jackson Police Department for almost twenty years and that he spent the last six years as a narcotics officer. His testimony regarding the approach to the house was substantially similar to Detective Wilson's account, and he also identified the defendants as the individuals secured in the bathroom. He recalled recovering the plastic bag of what appeared to be crack cocaine dripping with water, and he identified the bag. He described the area under the window where he located the bag as "packed down, raw dirt" like a path with heavy foot traffic.
¶ 23. Sergeant Renfroe explained that he recorded each item recovered, where it was found, and which officer found it. He identified two Motorola walkie-talkies and two Radio Shack walkie-talkies found in a bedroom dresser and explained that they are common items used by narcotics vendors to allow a "lookout" to communicate with the dealer as he is selling drugs. Sergeant Renfroe identified the scales recovered from the kitchen and described the scales as "the most elementary, basic, essential tool of narcotics transactions."
¶ 24. Sergeant Renfroe identified a cable bill addressed to Jones at the address that was searched. He identified the Garrett metal detector that was recovered from Jones's home and testified that such devices are commonly used to detect weapons by waving it over the body and that drug dealers use such devices to screen people for weapons or communications devices as they enter a drug sale location. He specified that the particular metal detector in evidence was on the couch in the front room of the house. During cross-examination, Sergeant Renfroe noted that they only recovered things that might be connected with possession or trafficking of drugs and that he would not have recovered hair clippers or anything that does not have evidentiary value.
¶ 25. Detective Richard Nations testified about his role in serving the search warrant. His account was substantially similar to those of the two officers who testified previously, and he also identified the defendants as the two suspects in the bathroom. He identified the $748 removed from Naylor's pocket at the police station, and he said that he also recovered $85 from a pair of jeans in the bedroom of the house, noting that it is common to find large sums of money when serving warrants like the one the officers served at Jones's residence. He testified that he did not think that the shower was running before he got into the bathtub with Detective Wilson and the two suspects.
¶ 26. Finally, John Dial, a criminalist for the Jackson Police Department crime laboratory, testified regarding his testing of the white substance in the plastic bag. After being qualified as an expert, Dial explained his testing methods and described the difference between crack cocaine and powdered cocaine hydrochloride. *482 He utilized a modified Scott test, infrared spectrometry, and an ion trap detector to determine that the sample was cocaine with a high moisture content.
¶ 27. The State rested its case-in-chief. Naylor's motion for a directed verdict was overruled. Jones moved for a directed verdict asserting an absence of proof of intent to distribute and claiming that the State proved no more than simple possession. The court overruled the motion.

D. THE DEFENSE'S CASE
¶ 28. Naylor's co-defendant presented one witness, Naylor's aunt, who testified that she asked Naylor to hold $750 for her the day before the search. Naylor did not testify.
¶ 29. After Naylor rested his case, Jones presented his own testimony in his defense. According to Jones, he was in the bathroom getting a haircut, and Naylor was holding the hair clippers when an officer came in, grabbed Jones, and threw him to the floor. Jones said that an officer kept instructing him to "spit it out," hitting him, and kicking him. He claimed that the beating resulted in a damaged nerve in his mouth and that he and Naylor were never in the bathtub.
¶ 30. Jones explained that he used the scales that were confiscated to weigh jewelry when he worked at a pawn shop, and he said that a friend who was a security guard, Anthony Adams, left the metal detector at Jones's house after he stayed with him for a while. Jones testified that he bought the Mossburg shotgun at a pawn shop two or three months prior to the search and that it was still in the box with no butt assembled to the gun when officers recovered it. He bought the Radio Shack walkie-talkie set at the mall just "for fun," and he found the non-functional Motorola walkie-talkies in the other side of his duplex with no battery pack.
¶ 31. On cross-examination, Jones explained that he did not present Anthony Adams as a witness because he "didn't know they were going to try to bring it up like that." He testified that he bought the Mossburg for self-defense and that the receipt was in the box which the officers confiscated. Jones admitted that he had no evidence of the beating except that Naylor saw it occur and that his lip was swollen at the time. After acknowledging that his lip did not appear to be swollen in the photograph taken at the police station, Jones said that he adjusted his mouth so that the swelling was not obvious in the picture. He never filed a complaint about the beating or sought treatment for his alleged injury.
¶ 32. Jones asserted that the officers testified falsely because they found no evidence in his home. He said that the officers actually took the plastic bag, which contained only salt, from his kitchen cabinet. When pressed on the question of whether the officers lied, Jones responded, "Well, they were wrong. They were wrong. They told me ... not to just say police officers are lying, so, you know, I don't want to say that." He explained that "they" meant his family and his lawyer.
¶ 33. The defense rested. The defendants renewed their motions for directed verdicts which were again denied. After instructions were read to the jury, the parties presented closing arguments, during which Jones addressed the jury.

E. THE VERDICT AND POST-TRIAL MOTIONS
¶ 34. The jury found both defendants guilty as charged with possession of cocaine with intent to distribute. The judge rendered sentences after reviewing presentence reports and hearing character witnesses. Jones was sentenced to fifteen years, with twelve years suspended, three years to serve in the custody of the Mississippi Department of Corrections, and three years of supervised probation.

III. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES
¶ 35. We will address Jones's issues in the order in which they arose during the proceedings below.

*483 A. Did the trial court err in refusing to quash the jury venire where members had ties to the prosecution?
¶ 36. Jones relies on the decision of Mhoon v. State, 464 So.2d 77 (Miss.1985), in asserting that the venire presented a "statistical aberration" requiring reversal. In Mhoon, twelve of the thirty-nine potential jurors were policemen or were related by blood or marriage to a current or former police officer. Id. at 80. Of those twelve, six sat on the jury after, and the jury foreman was a uniformed policeman. Id. at 82. The Mhoon court noted that the judge could have allowed additional peremptory challenges, increased the size of the venire, or sustained challenges for cause in order to diminish the prejudicial effect of a venire with so many ties to law enforcement. Id. at 81.
¶ 37. Although Jones asserts in his statement of this issue that many of the potential jurors had close ties to the prosecution, he argues that many jurors had ties to law enforcement.[2] By Jones's count, eighteen members of the venire claimed close ties with law enforcement; however, we find in the record only ten potential jurors who were in law enforcement or were related to law enforcement officers. Some venire members mentioned that they knew someone in the police department or the sheriffs office, but they were not related. The potential jurors collectively affirmed that they could be fair in this case in spite of connections to law enforcement.
¶ 38. The case at hand is further distinguishable from Mhoon. Of the ten potential jurors with "close ties" to law enforcement, only two served on the jury, as opposed to six in Mhoon. Id. at 80. One juror in the present case had a brother who was a police officer in another state, and one worked for the Mississippi Department of Corrections. Also, the defense used only five of its six peremptory challenges, whereas the defense in Mhoon used every peremptory challenge. Id.
¶ 39. The term "law enforcement" was applied in the present case to police officers, corrections officers, campus police officers, security guards, sheriff's deputies, highway patrol officers, volunteer sheriffs, FBI agents, and IRS agents. Given the breadth of the term "law enforcement" as it was applied during voir dire in the case sub judice, it would be difficult to find a venire without several close ties to "law enforcement." As noted in Shell v. State, 554 So.2d 887, 891 (Miss.1989) rev'd on other grounds in Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), "The [Mhoon] Court was careful to point out ... that the mere presence of law enforcement officials in a jury pool was not per se improper, provided the prospective juror was otherwise qualified and was not peremptorily struck by either party."
¶ 40. Distinguishing this case from Mhoon v. State and opining that Jones was not denied an impartial jury, we affirm the trial court as to this issue.

B. Did the trial court commit reversible error by allowing Detective Steve Renfroe to render expert testimony without having been tendered or accepted as an expert in violation of Rule 702, Mississippi Rules of Evidence?

1. Standard of Review
¶ 41. Rulings regarding the admission or suppression of evidence are within the broad discretion of the trial judge and will not be reversed absent an abuse of that discretion. Sumrall v. Mississippi Power Co., 693 So.2d 359, 365 (Miss.1997).

2. Analysis
¶ 42. Typically, if a defendant fails to timely object to an issue at trial, the issue is waived for appeal. Cavett v. State, 717 So.2d 722 (¶ 21) (Miss.1998); Hall v. State, 691 So.2d 415, 418 (Miss. 1997); McQuarter v. State, 574 So.2d 685, 687 (Miss.1990). The trial court will not be held in error on a legal point that was *484 never presented for its consideration. Chase v. State, 645 So.2d 829, 846 (Miss. 1994). Jones failed to object at trial, but he raised this issue in his motion for j.n.o.v. the verdict or for new trial. He now seeks review of this issue as "plain error."
¶ 43. Although Jones asserts that Detective Renfroe presented expert testimony, we note that Detective Renfroe did not give an opinion as contemplated in Mississippi Rule of Evidence 702. Instead, he answered the questions based upon his experience as a narcotics officer. Detective Renfroe explained his determinations that certain evidence was relevant to the charges against the defendants and should be recovered during the search. He explained why the scales, the walkie-talkies, and the metal detector had evidentiary value. Similarly, Detective Wilson answered Jones's questions during cross-examination based upon his experience:
JONES'S ATTORNEY: How long have you been working in narcotics?
DETECTIVE WILSON: Off and on for about twelve years.
JONES'S ATTORNEY: Your experience in dealing with crack cocaine, the sale of crack cocaine, can you tell us crack cocaine is sold by the rock or the piece; is that correct?
Jones also asked Detective Wilson whether, in his experience, he had observed instances in which crack cocaine was sold by weight.
¶ 44. Detective Renfroe did not have to be qualified as an expert to testify regarding his personal knowledge. He testified about the walkie-talkies based upon his experience:
PROSECUTOR: Detective, during the course of your employment as a narcotics officer have you ever seen items like what's been marked State's Exhibits 10 and 11 [walkie-talkies] before?
DETECTIVE RENFROE: Many times.
PROSECUTOR: Do you have personal knowledge as to how those particular items are used in the furtherance of drug or narcotics distribution activities?
DETECTIVE RENFROE: Yes, I do. Most of the time these radios are used for communicating devices for lookout to the main body of the narcotics vendors.
. . .
PROSECUTOR: Would you characterize it as common or uncommon finding these types of items in a particular house where narcotics activity is present?
DETECTIVE RENFROE: I would say that these are very common items for the more sophisticated narcotics vendors.
Detective Renfroe responded to similar questions about hand-held scales and metal detectors, testifying regarding the personal knowledge which he gleaned from working as a narcotics officer.
¶ 45. Discerning no plain error, we refrain from reversing the trial court, and we decide this issue adversely to Jones.

C. Was the evidence presented at trial insufficient to sustain a conviction for possession with intent to distribute?

1. Standard of Review
¶ 46. On review, reversal on the issue of sufficiency of the evidence will only be permitted "where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Wetz v. State, 503 So.2d 803, 808 (Miss.1987). The reviewing court should review the trial court's ruling on the last occasion that the sufficiency of the evidence was challenged before the trial court. Id. at 808 n. 3. All credible evidence must be appraised in the light most favorable to the verdict and must be accepted as true. Id. at 808.

*485 2. Analysis

¶ 47. In the present case, Jones challenged the sufficiency of the evidence in his motions for a directed verdict and in his motion for judgment notwithstanding the verdict. On appeal, Jones asserts that the following standard of review applies:
Taking all of the credible substantive evidence as true, it cannot be said with any degree of certainty that a reasonable, fair minded and properly charged jury would not have acquitted Jones on the charge of possession of a controlled substance with the intent to distribute. The State failed to meet its burden of proof by proving each and every element of the charged offense beyond a reasonable doubt. Tait v. State, 669 So.2d 85, 88 (Miss.1996); Smith v. State, 646 So.2d 538, 542 (Miss.1994); May v. State, 460 So.2d 778, 781 (Miss. 194[1984]); Glass v. State, 278 So.2d 384, 386 (Miss.1973).
¶ 48. The appropriate standard requires that the court view all credible evidence in the light most favorable to the verdict and consider such evidence as true. Wetz, 503 So.2d at 808. (emphasis added). In contrast, Jones's purported standard would require the court to examine the evidence in the light most favorable to the defendant.
¶ 49. In the record, we find evidence in the law enforcement officers' testimony which contradicts Jones's version of events during the execution of the search warrant and which contradicts Jones's explanation for the physical evidence recovered from his house. The Mississippi Supreme Court has explained that "the testimony of a single witness is sufficient to sustain a conviction though there may be more than one witness testifying to the contrary." Nash v. State, 278 So.2d 779, 780 (Miss.1973); see Ragland v. State, 403 So.2d 146, 147 (Miss.1981). It is the function of the jury to resolve any conflicts in the evidence presented and to decide which witnesses seem more credible. Melton v. State, 723 So.2d 1156 (¶ 30) (Miss. 1998); Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979). As for the sufficiency of the evidence, "[i]t is enough that the conflicting evidence presented a factual dispute for jury resolution." Id.
¶ 50. Because the testimony in this case presented a factual dispute, and because the credible evidence viewed in the light most favorable to the verdict was sufficient to raise a jury question, we find that the evidence was sufficient to overcome the motions for directed verdict and judgment notwithstanding the verdict. Furthermore, we opine that reasonable and fair-minded jurors would not be required to find Jones not guilty.

3. Weight of the evidence
¶ 51. Although Jones does not precisely address the weight of the evidence in stating his assertion of error, he suggests in his argument that the verdict was against the weight of the evidence. Therefore, we review the weight as well as the sufficiency of the evidence.[3]
¶ 52. After assessing the weight of the evidence, the trial court may, in its discretion, grant a new trial if it determines that a new trial is required in the interest of justice or if the verdict is contrary to law or the weight of the evidence. URCCC 10.05; Wetz, 503 So.2d at 812. The reviewing court will uphold the trial judge's decision unless convinced that the trial court abused its discretion. Wetz, 503 So.2d at 812. As the trial court evaluates whether the verdict is contrary to the overwhelming weight of the evidence, it must accept as true all evidence favorable to the verdict for the State. Turner v. State, 726 So.2d 117 (¶ 29) (Miss.1998); Van Buren v. State, 498 So.2d 1224, 1229 *486 (Miss.1986). Only if the jury's verdict is "so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice" should a new trial be granted. Wetz, 503 So.2d at 812; Malone v. State, 486 So.2d 360, 366 (Miss.1986); Groseclose v. State, 440 So.2d 297, 300 (Miss.1983); Pearson v. State, 428 So.2d 1361, 1364 (Miss.1983).
¶ 53. The State presented evidence that Jones was in the process of disposing of cocaine when the officers entered his home to serve the search warrant. Officers testified that Jones had a particular variety of items typically used in the drug trade and frequently recovered from narcotics dealers. The officers gave substantially similar accounts of the search, and the only testimony which contradicted the charge in the indictment was Jones's own testimony.
¶ 54. On review, this Court finds that the verdict was not so contrary to the applicable law or the weight of the evidence that it results in "unconscionable injustice." Therefore, we affirm the trial court's denial of the motion for new trial.

IV. CONCLUSION
¶ 55. This Court observes that Jones was not denied an impartial jury and that the venire and jury in this case were distinguishable from that in Mhoon v. State upon which Jones relies. Furthermore, we detect no plain error in allowing Detective Renfroe to testify based upon his personal knowledge.
¶ 56. Because the evidence presented a factual dispute for the jury to resolve, directed verdict and JNOV were properly denied. Likewise, the jury's verdict was not against the overwhelming weight of the evidence to such an extent that reversal was required to avoid unconscionable injustice, and the circuit court appropriately denied Jones's motion for new trial.
¶ 57. Finding no merit to Jones's assignments of error, we affirm the verdict and sentence of the circuit court.
¶ 58. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY OF CONVICTION OF POSSESSION OF COCAINE WITH INTENT TO DISTRIBUTE AND SENTENCE TO FIFTEEN YEARS, WITH TWELVE YEARS SUSPENDED, THREE YEARS TO SERVE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND THREE YEARS OF SUPERVISED PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO HINDS COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.
MOORE, J., NOT PARTICIPATING.
NOTES
[1] Jones testified in his defense that Naylor was using hair clippers to cut Jones's hair in the bathroom when the police entered the house.
[2] Only two potential jurors had arguably close ties to a prosecutor.
[3] The question of whether a verdict is against the overwhelming weight of the evidence arises when the party asserts that error in a motion for new trial. In his motion for JNOV, Jones contended, "The verdict is decidedly and strongly against the weight of the evidence and is contrary to law and the principles of justice and equity."